**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE: WESTERN STATES
WHOLESALE NATURAL GAS
ANTITRUST LITIGATION,

No. 11-16786

D.C. Nos.
2:03-cv-01431-
PMP-PAL
2:06-cv-00233-
PMP-PAL

LEARJET, INC.; TOPEKA UNIFIED
SCHOOL DISTRICT 501,
                    *Plaintiffs-Appellants*,

v.

ONEOK, INC.; ONEOK ENERGY
MARKETING & TRADING CO., L.P.;
THE WILLIAMS COMPANIES, INC.;
WILLIAMS MERCHANT SERVICES
COMPANY, INC.; WILLIAMS ENERGY
MARKETING & TRADING COMPANY;
AMERICAN ELECTRIC POWER
COMPANY, INC.; AEP ENERGY
SERVICES, INC.; DUKE ENERGY
CORPORATION; DUKE ENERGY
TRADING AND MARKETING, LLC;
DYNEGY MARKETING AND TRADE;
EL PASO CORPORATION; EL PASO
MERCHANT ENERGY, L.P.; CMS
ENERGY CORPORATION; CMS
MARKETING SERVICES & TRADING
COMPANY; CMS FIELD SERVICES;
RELIANT ENERGY, INC.; RELIANT

ENERGY SERVICES, INC.; CORAL ENERGY RESOURCES, L.P.; XCEL ENERGY, INC.; EPRIME, INC.,
        *Defendants-Appellees*.

IN RE: WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION,

HEARTLAND REGIONAL MEDICAL CENTER; PRIME TANNING CORP.; NORTHWEST MISSOURI STATE UNIVERSITY,
        *Plaintiffs-Appellants*,

v.

ONEOK, INC.; ONEOK ENERGY MARKETING & TRADING CO., L.P.; THE WILLIAMS COMPANIES, INC.; WILLIAMS MERCHANT SERVICES COMPANY, INC.; WILLIAMS ENERGY MARKETING & TRADING COMPANY; AMERICAN ELECTRIC POWER COMPANY, INC.; AEP ENERGY SERVICES, INC.; DUKE ENERGY CORPORATION; DUKE ENERGY TRADING AND MARKETING, LLC; DYNEGY MARKETING AND TRADE; EL PASO CORPORATION; EL PASO MERCHANT ENERGY, L.P.; CMS

No. 11-16798

D.C. Nos.
2:03-cv-01431-PMP-PAL
2:07-cv-00987-PMP-PAL

ENERGY CORPORATION; CMS
MARKETING SERVICES & TRADING
COMPANY; CMS FIELD SERVICES;
RELIANT ENERGY, INC.; RELIANT
ENERGY SERVICES, INC.; CORAL
ENERGY RESOURCES, L.P.; XCEL
ENERGY, INC.; EPRIME, INC.,
*Defendants-Appellees*.

IN RE: WESTERN STATES
WHOLESALE NATURAL GAS
ANTITRUST LITIGATION,

BRECKENRIDGE BREWERY OF
COLORADO, LLC; BBD ACQUISITION
CO.,
*Plaintiffs-Appellants*,

v.

XCEL ENERGY, INC.; EPRIME, INC.,
*Defendants-Appellees*.

No. 11-16799

D.C. Nos.
2:03-cv-01431-
PMP-PAL
2:06-cv-01351-
PMP-PAL

IN RE: WESTERN STATES
WHOLESALE NATURAL GAS
ANTITRUST LITIGATION,

No. 11-16802

D.C. Nos.
2:03-cv-01431-
PMP-PAL
2:05-cv-01331-
PMP-PAL

REORGANIZED FLI, INC.,
                *Plaintiff-Appellant*,

v.

ONEOK, INC.; ONEOK ENERGY
MARKETING & TRADING CO., L.P.;
THE WILLIAMS COMPANIES, INC.;
WILLIAMS MERCHANT SERVICES
COMPANY, INC.; WILLIAMS ENERGY
MARKETING & TRADING COMPANY;
AMERICAN ELECTRIC POWER
COMPANY, INC.; AEP ENERGY
SERVICES, INC.; DUKE ENERGY
CORPORATION; DUKE ENERGY
TRADING AND MARKETING, LLC;
DYNEGY MARKETING AND TRADE;
EL PASO CORPORATION; EL PASO
MERCHANT ENERGY, L.P.; CMS
ENERGY CORPORATION; CMS
MARKETING SERVICES & TRADING
COMPANY; CMS FIELD SERVICES;
RELIANT ENERGY, INC.; RELIANT
ENERGY SERVICES, INC.; CORAL
ENERGY RESOURCES, L.P.; XCEL
ENERGY, INC.; EPRIME, INC.,
                *Defendants-Appellees*.

| | |
|---|---|
| IN RE: WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION, | No. 11-16818 |
| | D.C. Nos. 2:03-cv-01431-PMP-PAL 2:06-cv-00282-PMP-PAL |
| SINCLAIR OIL CORPORATION, *Plaintiff-Appellant*, | |
| v. | |
| ONEOK ENERGY SERVICES COMPANY, L.P., *Defendant-Appellee.* | |

| | |
|---|---|
| IN RE: WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION, | No. 11-16821 |
| | D.C. Nos. 2:03-cv-01431-PMP-PAL 2:06-cv-00267-PMP-PAL |
| SINCLAIR OIL CORPORATION, *Plaintiff-Appellant*, | |
| v. | |
| EPRIME, INC.; XCEL ENERGY, INC., *Defendants-Appellees.* | |

IN RE: WESTERN STATES
WHOLESALE NATURAL GAS
ANTITRUST LITIGATION,

ARANDELL CORPORATION;
MERRICK'S INC.; SARGENTO FOODS
INC.; LADISH CO., INC.; CARTHAGE
COLLEGE; BRIGGS & STRATTON
CORPORATION,
                *Plaintiffs-Appellants*,

v.

XCEL ENERGY, INC.; NORTHERN
STATES POWER COMPANY; EPRIME,
INC.; AMERICAN ELECTRIC POWER
COMPANY, INC.; AEP ENERGY
SERVICES, INC.; CMS ENERGY
CORPORATION; CMS FIELD
SERVICES; CMS MARKETING
SERVICES & TRADING COMPANY;
CORAL ENERGY RESOURCES, L.P.;
DUKE ENERGY CAROLINAS, LLC;
DUKE ENERGY TRADING AND
MARKETING LLC; DYNEGY ILLINOIS
INC.; DMT G.P. L.L.C.; DYNEGY GP
INC.; EL PASO CORPORATION; EL
PASO MERCHANT ENERGY, L.P.;
ONEOK, INC.; ONEOK ENERGY
MARKETING & TRADING CO., L.P.;
RRI ENERGY, INC., FKA RELIANT
ENERGY, INC.; RRI ENERGY

No. 11-16869

D.C. Nos.
2:03-cv-01431-
PMP-PAL
2:07-cv-01019-
PMP-PAL

SERVICES, INC., FKA Reliant Energy
Services, Inc.; THE WILLIAMS
COMPANIES, INC.; WILLIAMS POWER
COMPANY, INC.; WILLIAMS ENERGY
MARKETING & TRADING COMPANY;
WILLIAMS MERCHANT SERVICES
COMPANY, INC.,
             *Defendants-Appellees*.

IN RE: WESTERN STATES
WHOLESALE NATURAL GAS
ANTITRUST LITIGATION,

NEWPAGE WISCONSIN SYSTEM, INC.,
             *Plaintiff-Appellant*,

v.

CMS ENERGY CORPORATION; CMS
MARKETING SERVICES & TRADING
COMPANY; CMS FIELD SERVICES;
XCEL ENERGY, INC.; NORTHERN
STATES POWER COMPANY; EPRIME,
INC.; CORAL ENERGY RESOURCES,
L.P.; DUKE ENERGY TRADING AND
MARKETING LLC; DYNEGY ILLINOIS
INC.; DMT G.P. L.L.C.; DYNEGY GP
INC.; DYNEGY MARKETING AND
TRADE; EL PASO CORPORATION; EL
PASO MERCHANT ENERGY, L.P.;
ONEOK, INC.; ONEOK ENERGY

No. 11-16876

D.C. Nos.
2:03-cv-01431-
PMP-PAL
2:09-cv-00915-
PMP-PAL

MARKETING & TRADING CO., L.P.;
RRI ENERGY SERVICES, INC., FKA
Reliant Energy Services, Inc.; THE
WILLIAMS COMPANIES, INC.;
WILLIAMS POWER COMPANY, INC.;
WILLIAMS ENERGY MARKETING &
TRADING COMPANY; WILLIAMS
MERCHANT SERVICES COMPANY,
INC.,
*Defendants-Appellees.*

IN RE: WESTERN STATES
WHOLESALE NATURAL GAS
ANTITRUST LITIGATION,

ARANDELL CORPORATION;
MERRICK'S INC.; SARGENTO FOODS
INC.; LADISH CO., INC.; CARTHAGE
COLLEGE; BRIGGS & STRATTON
CORPORATION,
*Plaintiffs-Appellants*,

v.

CMS ENERGY CORPORATION; CMS
MARKETING SERVICES & TRADING
COMPANY; CMS FIELD SERVICES,
*Defendants-Appellees.*

No. 11-16880

D.C. Nos.
2:03-cv-01431-
PMP-PAL
2:09-cv-01103-
PMP-PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
October 19, 2012—San Francisco, California

Filed April 10, 2013

Before: Carlos T. Bea and Paul J. Watford, Circuit Judges,
and Willliam K. Sessions, District Judge.[*]

Opinion by Judge Bea

---

## SUMMARY[**]

---

### Energy Law

The panel reversed in part, and affirmed in part, the district court's orders in cases consolidated into a multidistrict litigation proceeding, and arising out of the energy crisis of 2000-2002.

Plaintiffs, retail buyers of natural gas, alleged that defendants, natural gas traders, manipulated the price of natural gas by reporting false information to price indices

---

[*] The Honorable William K. Sessions, III, District Judge for the U.S. District Court for the District of Vermont, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

published by trade publications and engaging in wash sales. The district court entered summary judgment against plaintiffs in most of the cases, finding that state law antitrust claims were preempted by the Natural Gas Act.

The panel held that the Natural Gas Act does not preempt the plaintiffs' state antitrust claims, and reversed the summary judgment entered in favor of the defendants. The panel also held that the 2003 enactment of the Federal Energy Regulatory Commission's Code of Conduct did not affect the panel's conclusion that the Natural Gas Act does not grant FERC jurisdiction over claims arising out of false price reporting and other anticompetitive behavior associated with nonjurisdictional sales. The panel further held that the district court did not abuse its discretion in denying either of the two motions for leave to amend complaints. The panel reversed in part the district court's orders dismissing the AEP defendants from the Wisconsin *Arandell* and Missouri *Heartland* suits, and affirmed all the other orders at issue in these appeals.

---

## COUNSEL

Jennifer Gille Bacon (argued), William E. Quirk, and Gregory M. Bentz, Polsinelli Shughart PC, Kansas City, Missouri, for Appellants Learjet, Inc., et al., Heartland Regional Medical Center, et al., Breckenridge Brewery of Colorado, LLC, et al., Reorganized FLI, Inc., and Sinclair Oil Corporation.

Robert L. Gegios, Alexander T. Pendleton, and William E. Fischer, Kohner, Mann & Kailas, S.C., Milwaukee, Wisconsin, for Wisconsin Plaintiffs-Appellants.

Mark E. Haddad (argued), Michelle B. Goodman, and Nitin Reddy, Sidley Austin LLP, Los Angeles, California, for Defendants-Appellees CMS Energy Corp., CMS Energy Resources Management Co., and Cantera Gas Company.

Michael J. Kass and Douglas R. Tribble, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, California, for Defendants-Appellees Dynegy Marketing & Trade, Dynegy Illinois, Inc., DMT G.P. L.L.C., and Dynegy GP Inc.

Joshua D. Lichtman, Fulbright & Jaworski L.L.P., Los Angeles, California, and Roxanna A. Manuel, Quinn Emanuel Urquhart & Sullivan, LLP, for Defendant-Appellee Coral Energy Resources, L.P.

Joel B. Kleinman, Adam Proujanski, and Lisa M. Kaas, Dickstein Shapiro LLP, Washington, D.C., for Defendants-Appellees Duke Energy Trading and Marketing, L.L.C. and Duke Energy Carolinas, LLC.

Robert B. Wolinsky, Hogan Lovells US LLP, Washington, D.C., and Steven J. Routh, Orrick, Herrington & Sutcliffe, L.L.P., Washington, D.C., for Defendants-Appellees American Electric Power Company, Inc. and AEP Energy Services, Inc.

Brent A. Benoit and Stacy Williams, Locke Lord Bissell & Liddell LLP, Houston, Texas, for Defendants-Appellees El Paso Corporation, El Paso Merchant Energy, L.P., and El Paso Marketing, L.P.

Amelia A. Fogleman, Oliver S. Howard, and Craig A. Fitzgerald, Gable Gotwals, A Professional Corporation, Tulsa, Oklahoma, for Defendants-Appellees ONEOK, Inc., ONEOK Energy Services Company L.P.

J. Gregory Copeland and Mark R. Robeck, Baker Botts LLP, Houston, Texas, for Defendant-Appellee Reliant Energy Services, Inc.

Graydon Dean Luthey, Jr. and Sarah Jane Gillett, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Oklahoma, for Defendants-Appellees The Williams Companies, Inc., Williams Merchant Services Company, Inc., Williams Power Company, Inc., and Williams Energy Marketing & Trading Company.

Michael John Miguel, K & L Gates LLP, Los Angeles, California, for Defendants-Appellees Xcel Energy, Inc., e prime, inc., e prime Energy Marketing, Inc., and Northern States Power Company.

## OPINION

BEA, Circuit Judge:

These cases arise out of the energy crisis of 2000–2002. Plaintiffs (retail buyers of natural gas) allege that Defendants (natural gas traders) manipulated the price of natural gas by reporting false information to price indices published by trade

publications and engaging in wash sales.[1]  Plaintiffs brought various claims in state and federal court beginning in 2005, and all cases were eventually consolidated into the underlying multidistrict litigation proceeding.  In July 2011, the district court entered summary judgment against Plaintiffs in most of the cases,[2] finding that their state law antitrust claims were preempted by the Natural Gas Act, 15 U.S.C. § 717 *et seq.* ("NGA").  Plaintiffs appeal the district court's order granting summary judgment, as well as orders denying as untimely Plaintiffs' motions to amend their complaints, orders dismissing the AEP Defendants from two cases for lack of personal jurisdiction, and an order granting partial summary judgment to Defendant Duke Energy Trading and Marketing, LLC.

We have jurisdiction pursuant to 28 U.S.C. § 1291.  We reverse the district court's order granting summary judgment to the Defendants, reverse in part the district court's orders dismissing the AEP Defendants from the Wisconsin *Arandell* and Missouri *Heartland* suits, and affirm all of the other orders at issue in this appeal.  We remand to the district court for further proceedings consistent with this opinion.

---

[1] Wash sales are prearranged sales in which traders execute a trade on an electronic trading platform, and then immediately offset that trade by executing an equal and opposite trade.

[2] The district court's judgment is final in all cases except *Sinclair v. E-Prime*, No. 11-16821, and *Sinclair v. Oneok*, No. 11-16818. The Plaintiffs' complaints in the *Sinclair* cases contain federal claims that were not preempted, but the District Court declared that there was "no just reason for delay," making the preemption rulings in *Sinclair v. E-Prime* and *Sinclair v. Oneok* final and appealable pursuant to Federal Rule of Civil Procedure 54(b).

## I.  Facts and Regulatory Framework

### A.  Energy Crisis of 2000–2002

A brief recitation of the background of this litigation, as well as a description of the regulatory framework governing this case, is useful to set the stage for our holding.  These cases arise out of claims that the Defendants violated antitrust laws by manipulating the natural gas market and selling natural gas at artificially inflated prices, leading to the energy crisis of 2000–2002.  The Federal Energy Regulatory Commission ("FERC") conducted a fact-finding investigation of the energy crisis, and concluded that "[s]pot gas prices rose to extraordinary levels, facilitating the unprecedented price increase in the electricity market."  This market distortion stemmed in part from efforts of energy trading companies to manipulate price indices compiled by trade publications.

The natural gas industry relied on two trade publications, *Gas Daily* and *Inside FERC*, which published the most widely-used price indices. *Gas Daily* published a daily gas price index, while *Inside FERC* published a monthly gas price index. *Gas Daily* relied on telephone interviews with natural gas market participants (traders, end users,[3] and producers) to collect pricing data.  *Inside FERC* collected pricing data through standardized spreadsheets, which traders filled out and emailed to *Inside FERC.*  Buyers and sellers relied on these indices as reference points to determine the market price for natural gas transactions.  In short, the prices for actual transactions were pegged to price indices that were subject to manipulation by energy traders.

---

[3] The term "end users" refers to industrial, commercial, and residential consumers of gas, such as the Plaintiffs in this case.

After the energy crisis of 2000–2002, a number of energy trading companies admitted that their employees provided false pricing data to *Gas Daily* and *Inside FERC*. Government investigations revealed that the companies had few, if any, internal controls in place to ensure the accuracy of the data reported to the trade publications. A 2003 FERC report described the process as follows:

> Traders from all companies describe a typical trading day as hectic, pressure packed, and frenetic. One of their many tasks was to report trading data to the Trade Press; this was viewed as bothersome but necessary. Often it was a job given to the newest employee. Many companies report passing around a form and using a spreadsheet on a shared drive. . . . There was nothing to stop a trader from changing the numbers someone else had entered. In other cases, traders took an oral "survey" to get a sense of where the market was trading. Sometimes they represented it to the Trade Press as an actual survey, but in other cases they made up trades to average out to a number that was consistent with this "survey."

In addition to reporting false data to the price indices, traders also manipulated the market by engaging in "wash sales," or prearranged sales in which traders "agreed to execute a buy or a sell on an electronic trading platform . . . and then to immediately reverse or offset the first trade by bilaterally executing over the telephone an equal and opposite buy or sell."

## B.  Overview of Natural Gas Regulation

Whether Plaintiffs' state law antitrust claims are cognizable depends, for one thing, on whether the field of natural gas regulation has been preempted by federal regulation.  This court's preemption analysis is governed by the framework of natural gas regulation, and more importantly, the distinction between categories of sales that fall within FERC's jurisdiction ("jurisdictional sales") and the categories of sales that fall outside of FERC's jurisdiction ("non-jurisdictional sales").

Individual states were originally responsible for the regulation of the production, sale, and transportation of natural gas.  However, as the volume of gas sold and transported along interstate pipelines increased, state regulations became regarded by Congress as ineffective.  *See Panhandle Eastern Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 515 (1947).  In 1938, Congress enacted the Natural Gas Act ("NGA") in response to the demand for federal regulation and to curb the market power of interstate pipelines.  *Id.* at 516; *see also E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1036 (9th Cir. 2007).  FERC is the agency charged with the administration of the NGA, and its jurisdiction is laid out in Section 1(b) of the Act as follows:

> The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of

natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

15 U.S.C. § 717(b).  Put simply, the NGA applies to: (1) transportation of natural gas in interstate commerce, (2) natural gas sales in interstate commerce for resale (i.e., wholesale sales), and (3) natural gas companies[4] engaged in such transportation or sale.  The NGA does *not* apply to retail sales (i.e., direct sales for consumptive use).  *See Panhandle Eastern Pipe Line Co.*, 332 U.S. at 517 ("The line of the statute [is] thus clear and complete.  It cut[s] sharply and cleanly between sales for resale and direct sales for consumptive uses.").

Since the passage of the NGA, Congress has removed other categories of sales from the scope of FERC's jurisdiction as part of a general effort to reduce federal regulation of the natural gas industry.  In 1989, Congress passed the Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, which removed "first sales"[5] from FERC's

---

[4] A "natural-gas company" is defined as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." 15 U.S.C. § 717a(6).

[5] The statutory definition of "first sales" is quite complex, *see* 15 U.S.C. 3301(21), but as this court stated in *Gallo*, "first sales are, in essence, merely sales of natural gas that are not preceded by a sale to an interstate pipeline, intrastate pipeline, local distribution company, or retail customer. In other words, sales by pipelines, local distribution companies, and their

jurisdiction, therefore completely eliminating FERC's authority to set prices at the wellhead. In 1992, to give effect to the North American Free Trade Agreement, Congress amended the NGA to provide that all natural gas sales from Canadian and Mexican sellers to buyers in the United States are also first sales, and therefore not subject to FERC's jurisdiction. *See* Energy Policy Act of 1992, Pub. L. No. 102-486 (codified at 15 U.S.C. § 717b(b)).

The final aspect of the natural gas regulatory scheme relevant to this appeal is FERC's practice of issuing "blanket marketing certificates."[6] Following congressional efforts to reduce federal regulation of the industry, FERC began its own deregulation process. In 1992, FERC promulgated Order 636, which "required all interstate pipelines to 'unbundle'[7]

---

affiliates cannot be first sales unless these entities are selling gas of their own production." *Gallo*, 503 F.3d at 1037.

[6] Under blanket certificates issued pursuant to Section 7(c) of the NGA, "a natural gas company may undertake a restricted array of routine activities without the need to obtain a case-specific certificate for each individual project." *See* BLANKET CERTIFICATES, FEDERAL ENERGY REGULATORY COMMISSION (last visited on March 25, 2013), http://www.ferc.gov/industries/gas/indus-act/blank-cert.asp. A company with a blanket certificate may "construct, modify, acquire, operate, and abandon a limited set of natural gas facilities, and offer a limited set of services, provided each activity complies with constraints on costs and environmental impacts set forth in the Commission's regulations." *Id.*

[7] "Prior to the early 1980s, most natural gas was sold at or near the wellhead to the intrastate or interstate pipeline in the field. . . . The pipeline purchasers typically provided a bundled service which included the gathering, processing, storage and transmission of the gas to market." Judith M. Matlock, *Federal Oil and Gas Pipeline Regulation: An Overview*, ROCKY MOUNTAIN MINERAL LAW FOUND. Paper No. 4 (Feb. 23–24, 2011).

their transportation from their own natural gas sales." *General Motors Corp. v. Tracy*, 519 U.S. 278, 284 (1997); Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 57 Fed. Reg. 13,267 (Apr. 16, 1992). FERC also issued blanket sale certificates to interstate pipelines that allowed them to offer "unbundled" natural gas at market-based rates, rather than at rates filed with FERC. *See* 57 Fed. Reg. at 13,270. FERC continued its own deregulation process by issuing blanket sales certificates for all other resales of natural gas. *See* Regulations Governing Blanket Marketer Sales Certificates, 57 Fed. Reg. 57,952; 57,957–58 (Dec. 8, 1992). These blanket certificates had the effect of allowing all natural gas companies subject to FERC's jurisdiction to charge market-based rates, as opposed to rates filed with and approved by FERC.

## II. Procedural History

Beginning in 2001, a series of class action lawsuits were filed around the country and were eventually consolidated into a multi-district litigation in the District of Nevada. Two of the earliest cases, *Texas-Ohio Energy, Inc. v. AEP Energy Services, Inc.*, *et al.* ("*Texas-Ohio*") and *Abelman v. AEP Energy Services, Inc., et al.* ("*Abelman*") alleged both Sherman Act and parallel state antitrust claims. *See In re Western States Wholesale Natural Gas Antitrust Litig.*, 368 F. Supp. 2d 1110 (D. Nev. 2005); *In re Western States Wholesale Natural Gas Antitrust Litig.*, 408 F. Supp. 2d 1055 (D. Nev. 2005). The core allegations in *Texas-Ohio* and *Abelman* – that the defendant energy companies conspired to manipulate the price indices – were similar to the allegations in the present case.

The defendants in *Texas-Ohio* and *Abelman* moved to dismiss the complaints in those cases on the grounds that all claims were barred by the filed-rate doctrine[8] and that the state-law claims were preempted by the NGA. In 2005, four months before the first of the present cases was filed, the District Court granted summary judgment to the *Texas-Ohio* and *Abelman* defendants. It held that because the plaintiffs asked for actual damages, any judgment by the court would necessarily decide whether the privately-published price indices (which the court concluded were effectively FERC-approved rates) were reasonable. Since the price indices used to set the rates were FERC-approved, the federal and state law claims were barred by the filed-rate doctrine. *Texas-Ohio*, 368 F. Supp. 2d at 1116; *Abelman*, 408 F. Supp. 2d at 1069.

Shortly after the judgments in *Texas-Ohio* and *Abelman*, plaintiffs in *Farmland*,[9] *Learjet*, *Breckenridge*, *Arandell*, and *Heartland* began filing suits alleging state antitrust claims in Colorado, Kansas, Missouri, and Wisconsin state courts. Plaintiffs in *Sinclair v. E-Prime* and *Sinclair v. Oneok*

---

[8] The filed-rate doctrine "is a judicial creation that arises from decisions interpreting federal statutes that give federal agencies exclusive jurisdiction to set rates for specified utilities" and bars "challenges under state law and federal antitrust laws to rates set by federal agencies." *E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1033 (9th Cir. 2007). *See also Arkansas Louisiana Gas Company v. Hall*, 453 U.S. 571, 577 (1981) (stating that because the Natural Gas Act required sellers of natural gas in interstate commerce to file their rates with FERC for FERC's approval, "[n]o court may substitute its own judgment on reasonableness for the judgment of the Commission").

[9] As a result of bankruptcy proceedings, the name of the Plaintiff in this case has changed to "Reorganized FLI, Inc." For the sake of simplicity we refer to this Plaintiff as "Farmland" in this opinion.

brought suit in federal court, alleging various state and federal causes of action. The state cases were removed to federal court on grounds of diversity of citizenship and all cases were consolidated into the present multidistrict litigation.

Defendants in the present case filed a number of motions for summary judgment, alleging that the Plaintiffs' claims were barred by the filed-rate doctrine, or that their state claims were preempted by the NGA. In 2006, the District Court granted the Defendants' motion to dismiss in *Farmland*, finding that the NGA preempted the Plaintiffs' claims under Kansas antitrust statutes. The District Court reasoned that because the Defendants possessed blanket marketing certificates that subjected Defendants and their conduct to FERC's jurisdiction under the NGA, FERC had exclusive jurisdiction over the alleged anti-competitive misconduct at issue. In July 2007, the District Court reconsidered and vacated its prior ruling granting Defendants' motion to dismiss after Plaintiffs clarified that they did not concede the factual question of whether Defendants possessed blanket marketing certificates.

In September 2007, this court issued its decision in *E. & J. Gallo Winery v. Encana Corp.*, holding that the filed-rate doctrine does not bar state or federal antitrust claims arising out of manipulation of the price indices because the challenged price indices were compiled using transactions outside of FERC's jurisdiction as well as transactions within FERC's jurisdiction. 503 F.3d at 1048.

In November 2007, Defendants filed a new motion for summary judgment in in all of the present cases, arguing that Plaintiffs' state claims were preempted by the NGA. In May

2008, the District Court denied the motion, relying in part on this court's decision in *Gallo.*

In July 2008, Defendants filed a motion for reconsideration of the District Court's May 2008 order, arguing that FERC had jurisdiction during the relevant time period to regulate "any practice" affecting a rate subject to the jurisdiction of the Commission (i.e., a "jurisdictional rate"). In November 2009, the District Court held that because the same price indices are used to set the prices in transactions falling within and outside FERC's jurisdiction, any manipulation of these indices falls within FERC's exclusive jurisdiction under Section 5(a) of the NGA. Section 5(a) provides:

> [Whenever FERC finds] that *any* rate, charge, or classification . . . [or] *rule, regulation, practice, or contract affecting such rate, charge, or classification* is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed or in force, and shall fix the same by order.

15 U.S.C. § 717d (emphases added). The District Court reasoned that pursuant to Section 5(a) of the NGA, FERC has jurisdiction to regulate any "practice" by a jurisdictional seller that affects a jurisdictional rate. The court ordered Defendants to re-file their motion for summary judgment, and in July 2011, the court granted the Defendants' motion for summary judgment as applied to all Plaintiffs. This appeal followed.

## III.    The Natural Gas Act and Preemption

### A.  Standard of Review

This court reviews a district court's grant of summary judgment *de novo*.  *See Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004).  Summary judgment is appropriate only where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rosenbaum v. Washoe Cnty*., 663 F.3d 1071, 1075 (9th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)).  "Viewing the evidence in the light most favorable to the non-moving party," this court "must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001).  This court also reviews a district court's decisions regarding preemption *de novo*.  *See Whistler Investments, Inc. v. Depository Trust & Clearing Corp.*, 539 F.3d 1159, 1163 (9th Cir. 2008).

### B.  Preemption

The "touchstone in every pre-emption case" is expressed congressional intent.  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  The Supreme Court recently emphasized that in preemption cases, courts should "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Id*.  In the present case, the presumption against preemption applies with particular force

in light of Congress's deliberate efforts to preserve traditional areas of state regulation of the natural gas industry.

The question presented by this appeal is as follows: does Section 5(a) of the NGA, which provides FERC with jurisdiction over any "practice" affecting jurisdictional rates, preempt state antitrust claims arising out of price manipulation associated with transactions falling outside of FERC's jurisdiction? We conclude that such an expansive reading of Section 5(a) conflicts with Congress's express intent to delineate carefully the scope of federal jurisdiction through the express jurisdictional provisions of Section 1(b) of the Act. Our analysis is guided by several circuit court decisions counseling in favor of a narrow reading of Section 5(a). As a result, we hold that the NGA does not preempt the Plaintiffs' state antitrust claims, and reverse the district court's order granting summary judgment to the Defendants.

**1.** When Congress enacted the NGA in 1938, it expressly limited federal jurisdiction over natural gas to "the sale in interstate commerce of natural gas for resale." 15 U.S.C. § 717(b). An early Supreme Court case interpreting the scope of the NGA described Congress's intent as follows:

> The omission of any reference to other sales, that is, to direct sales for consumptive use, in the affirmative declaration of coverage was not inadvertent. It was deliberate. For Congress made sure its intent could not be mistaken by adding the explicit prohibition that the Act "shall not apply to any other . . . sale."

*Panhandle Eastern Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 516 (1947). A later Supreme Court decision further emphasized Congress's intent to limit the reach of the NGA:

> When it enacted the NGA, Congress carefully divided up regulatory power over the natural gas industry. It did not envisage federal regulation of the entire natural gas field to the limit of constitutional power. Rather it contemplated the exercise of federal power as specified in the Act.

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan*., 489 U.S. 493, 510 (1989). Since the passage of the NGA, Congress has further demonstrated its intent to limit the scope of federal regulation by enacting statutes removing first sales from FERC's jurisdiction. *See* Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157.[10]

**2.** This court's decision in *Gallo* provides further support for our holding that the NGA does not preempt all state antitrust claims. The claims in *Gallo* were essentially the same as the Plaintiffs' claims in the present case. E. & J. Gallo Winery alleged that EnCana Corp., a natural gas supplier, conspired to inflate the price of natural gas by manipulating the prices reported to private indices published by natural gas trade publications and the execution of wash

---

[10] In 1978 Congress enacted the Natural Gas Policy Act ("NGPA"), Pub. L. No. 95-621, 92 Stat. 3352, which eliminated the low price ceilings on wellhead sales. However, the Natural Gas Wellhead Decontrol Act of 1989 ("WDA") completely eliminated FERC's authority to set prices at the wellhead.

trades. *Gallo*, 503 F.3d at 1030–32. Gallo's complaint consisted of federal and state antitrust actions, as well as state-law damages claims. *Id.* at 1032. Encana Corp. moved for summary judgment, claiming that the filed-rate doctrine barred all of Gallo's federal claims, and federal preemption principles barred Gallo's state claims. *Id.* at 1032. The district court denied EnCana's summary judgment motion, and this court affirmed the district court. *Id.* at 1030.

We noted in *Gallo* that although FERC did not set the rates charged by the natural gas companies, it did engage in market oversight by granting blanket market certificates after determining that the seller lacked market power. *Id.* at 1041. As a result of FERC's market oversight, the court found "that the market-based rate for natural gas transactions *under FERC's jurisdiction* are FERC-authorized rates, and cannot be the basis of a federal antitrust or state damage action" because of the filed-rate doctrine. *Id.* at 1043 (emphasis added).

Although this court found that the filed-rate doctrine barred claims based on FERC-authorized rates, it distinguished claims based on FERC-authorized rates from claims based on the rates reported in the price indices. *Id.* at 1045. It stated that the record reflected that "the indices potentially include transactions that are under FERC's jurisdiction as well as transactions outside FERC's jurisdiction." *Id.* There were two relevant categories of non-FERC-authorized rates included in the challenged price indices:

> First, there is evidence in the record some index pricing inputs were misreported or wholly fictitious. Misreported rates and rates

reported for fictitious transactions are not FERC-approved rates, and barring claims that such fictitious transactions damaged purchasers in the natural gas market would not further the purpose of the filed rate doctrine.

Moreover, as part of its investigation of the indices, FERC concluded that it "has jurisdiction over *most* of the transactions that form the basis for the indices." . . . This language indicates that at least some of the transactions included in the indices are not subject to FERC's jurisdiction, and thus would be subject to challenge by Gallo.

*Id.* at 1045 (internal citations omitted). The non-jurisdictional transactions included in the price indices included first sales at the wellhead or via imports from Canada or Mexico. *Id.*

We explained in depth why the removal of certain transactions from FERC's jurisdiction meant that claims arising out of those transactions were not preempted by the NGA. *Id.* at 1046. Most importantly, we assumed that Congress was aware of the existing context of state and federal antitrust law when it enacted the Wellhead Decontrol Act and other statutes limiting FERC's jurisdiction. *Id.* State and federal antitrust laws complement Congress's intent to move to a less regulated market, because such laws support fair competition. *Id.* ("By enabling private parties to combat market manipulation and other anti-competitive actions, the laws under which Gallo brought its claim support Congress's determination that the supply, the demand, and the price of

high-cost first sale gas be determined by market forces.") (internal quotations omitted).   For these reasons, we concluded that "Congress did not preclude plaintiffs from basing damage claims on rates associated with first sales." *Id.*  Our reasoning in *Gallo* applies with equal force to the question presented by this case: federal preemption doctrines do not preclude state law claims arising out of transactions outside of FERC's jurisdiction.

## C.  The NGA's Jurisdictional Limitations

The district court in the present case acknowledged this court's holding in *Gallo*, but distinguished that case on the grounds that "*Gallo* did not address whether FERC's exclusive jurisdiction over natural gas companies *and their practices which affect jurisdictional rates* preempts state jurisdiction over the same subject matter."  It reasoned that Defendants' status as FERC-regulated entities, combined with FERC's authority under Section 5(a) of the NGA to regulate "any rule, regulation, practice, or contract" affecting a jurisdictional rate, conferred exclusive jurisdiction on FERC to regulate the conduct at issue in this case.

The district court read the word "practices" in Section 5(a) of the NGA to preempt impliedly the application of state laws to the same transactions (first sales and retail sales) that Congress expressly exempted from the scope of FERC's jurisdiction in Section 1(b) of the Act.  However, this reading runs afoul of the canon of statutory construction that statutory provisions should not be read in isolation, and the meaning of a statutory provision must be consistent with the structure of the statute of which it is a part.  *See, e.g.*, *Waggoner v. Gonzales*, 488 F.3d 632, 636 (5th Cir. 2007) ("When interpreting statutes . . . each part or section of a statute

should be construed in connection with every other part or section to produce a harmonious whole."). The district court's reading is also inconsistent with case law interpreting the provisions of Section 5(a) of the NGA narrowly to comport with the jurisdictional limitations established by Section 1(b) of the Act. While the Ninth Circuit has not had the opportunity to define the scope of Section 5(a), the Supreme Court and other circuits have read Section 5(a) narrowly to define the scope of FERC's jurisdiction within the limitations imposed by Section 1(b).

**1.** In *Northwest Central Pipeline Corp. v. State Corporation Commission of Kansas*, the Supreme Court relied on the jurisdictional limitations established in Section 1(b) of the NGA to uphold a state regulation on the production of gas. 489 U.S. 493, 496 (1989). The State Corporate Commission of Kansas (KCC) had adopted a regulation governing the timing of natural gas production from the Kansas-Hugoton field. *Id.* The regulation provided that the right to extract assigned amounts of gas from the field would be lost if pipelines delayed production for too long. *Id.* at 497. Northwest Central Pipeline Corporation challenged the regulation, arguing that it was preempted by federal regulation of the interstate gas industry because the regulation exerted pressure on pipelines to increase their purchases from the Hugoton field and therefore affected the pipelines' cost structures. *Id.* at 497, 507 (noting that Northwest Central argued that "the federal regulatory scheme pre-empts state regulations that may have either a direct or indirect effect on matters within federal control").

The Supreme Court rejected Northwest Central's argument, relying on the fact that Section 1(b) of the NGA "expressly carve[d] out a regulatory role for the States" and

provided that states would retain jurisdiction over the production of natural gas. *Id.* at 507. It also rejected the pipeline's claim that federal regulations preempted all state regulations that may affect rates within federal control, stating:

> To find field pre-emption of Kansas' regulation merely because purchasers' costs and hence rates might be affected would be largely to nullify that part of NGA § 1(b) that leaves to the States control over production, for there can be little if any regulation of production that might not have at least an incremental affect on the costs of purchasers in some market and contractual situation.

*Id.* at 514.

In *American Gas Association v. Federal Energy Regulatory Commission*, the D.C. Circuit examined FERC's refusal to use its authority under Section 5 of the NGA to modify "take-or-pay" contracts[11] between natural gas producers and pipelines. 912 F.2d 1496, 1503 (D.C. Cir. 1990). A "major premise" of FERC's refusal to act was its conclusion that its Section 5 power did not reach nonjurisdictional contracts. *Id.* at 1505. The court concluded, "As we read the Natural Gas Act, the Commission

---

[11] Certain contracts entered into by producers and pipelines between 1977–1982 contained "take-or-pay" clauses requiring the pipelines either to purchase a specified percentage of the producer's deliverable gas or to make "pre-payments" for that percentage. *See Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1021 (D.C. Cir. 1987).

was absolutely right: Congress clearly limited its § 5 powers to jurisdictional contracts." *Id.*

The petitioners in *American Gas Association* had offered an argument similar to the one offered by the Defendants in the present case: they isolated the phrase "contract affecting such rates" and argued that FERC had jurisdiction to assess the justness and reasonableness of the provisions of *any* contract that would likely influence a pipeline's end-of-pipelines prices. *Id.* FERC, on the other hand, interpreted "contract affecting such rates" as being limited to contracts involving a jurisdictional seller and directly governing the rate in a jurisdictional sale. *Id.* at 1506. The D.C. Circuit agreed with FERC, stating that "petitioners' theory is, more generally, an oxymoron – Commission jurisdiction over nonjurisdictional contracts." *Id.* The court also noted that the petitioners' expansive reading of Section 5 had no "conceptual core" because under their interpretation, Section 5 would reach "pipelines' contracts for every other possible factor of production – even legal services." *Id.* at 1507.

We find the analysis of these cases persuasive, and apply them here. Interpreting the jurisdictional provision in Section 5(a) broadly to find FERC jurisdiction over price manipulation associated with nonjurisdictional sales would risk nullifying the jurisdictional provisions of Section 1(b), which reserve to the states regulatory authority over nonjurisdictional sales, such as first sales at the wellhead or from sellers in Canada and Mexico. Under the broad reading of Section 5(a) that Defendants propose, there is no "conceptual core" delineating transactions falling within FERC's jurisdiction and transactions outside of FERC's jurisdiction. There would be nothing stopping a future court from finding that first sales themselves (which are exempted

from FERC's jurisdiction pursuant to Section 1(b) of the Act) are "practices" affecting jurisdictional rates that fall within the jurisdictional provision in Section 5(a). We reject this broad reading and hold that the district court erred in concluding that FERC had jurisdiction over the reporting practices associated with nonjurisdictional sales under Section 5(a).

**2.** Another D.C. Circuit case, *California Independent System Operator Corporation v. Federal Energy Regulatory Commission*, does not address the interplay between the jurisdictional limits outlined in Section 1(b) and the jurisdictional provision in Section 5(a), but it does provide further support for a narrow interpretation of the word "practices" in Section 5(a). 372 F.3d 395 (D.C. Cir. 2004). The California Independent System Operator Corporation (CAISO) was a non-profit entity created by the state of California to operate electric grid facilities in California. *Id.* at 397. By statute, CAISO was obligated to follow certain procedures for selecting a board of directors composed exclusively of California residents. *Id.* After the energy crisis of 2000, FERC directed CAISO to utilize a different selection method for its board of directors. *Id.* at 397–98. FERC claimed that it had authority to issue such a directive under Section 206 of the Federal Power Act,[12] which provided, "Whenever the Commission [shall find] that any

---

[12] The language at issue from the Federal Power Act in *CAISO* is identical to the language at issue from the NGA in the present case. The Supreme Court noted in *Arkansas Louisiana Gas Company v. Hall* that the relevant provisions of the Federal Power Act and the Natural Gas Act "are in all material respects substantially identical," and therefore the Court's established practice is to "cit[e] interchangeably decisions interpreting the pertinent sections of the two statutes." 453 U.S. 571, 577 n.7 (1981) (internal quotations omitted).

rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential," the Commission shall determine the just and reasonable practice to be observed thereafter. *Id.* at 399 (quoting 16 U.S.C. § 824e(a)). Specifically, FERC claimed that the composition and method of selection of a utility company's governing board was a "practice . . . affecting [a] rate," and that because FERC had found that CAISO's selection method was discriminatory, FERC had authority to determine a just and reasonable practice. *Id.*

The D.C. Circuit began its analysis with the "plain language" of the statutory text. *Id.* at 400. It found that the word "practices" is a word of sufficiently diverse meanings that the proper method for determining Congressional intent was to apply the canon of statutory construction "*noscitur a sociis.*"[13] The court looked at the word "practices" in context, finding that Section 5(a) comes into play only after the Commission has a hearing and determines that a "rate, charge, or classification" employed by a regulated utility in a jurisdictional transaction is unjust or unreasonable. *Id.* Therefore, the court found that by using the word "practice," Congress had intended to empower FERC to "effect a reformation of some 'practice' in a more traditional sense of actions habitually being taken by a utility in connection with a rate found to be unjust or unreasonable." *Id.* The court noted that the implications of a broader reading of the word "practices" would be "staggering" because FERC would have

---

[13] *Noscitur a sociis* means that "a word is known by the company it keeps," and this canon is applied "where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).

jurisdiction over a plethora of activities, such as the methods of contracting for services, labor, or office space, as long as FERC found that such "practices" affected the jurisdictional rates. We agree with the D.C. Circuit's approach to reading the word "practices" narrowly as to not expand unduly the scope of FERC's jurisdiction.

**3.** Defendants rely on *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988) ("*MP&L*") for the proposition that "FERC's jurisdiction over a practice or contract affecting a jurisdictional rate preempts state law from being used to regulate that practice or contract." *Mississippi Power & Light* involved a FERC order requiring four utility companies to purchase a particular share of a nuclear power plant's output at rates FERC determined to be just and reasonable. *Mississippi Power & Light Co.*, 487 U.S. at 364. One of the utility companies, Mississippi Power & Light, filed an application with the Mississippi Public Service Commission ("MPSC") seeking a substantial increase in its retail rates to recoup the costs of purchasing a portion of the nuclear power plant's output. *Id.* at 365. The Mississippi Supreme Court eventually ruled that the MPSC was required, in accordance with state law, to review the prudence of incurring costs associated with purchasing the nuclear power plant's output. *Id.* at 367.

The Supreme Court reversed. The Court stated that FERC's exclusive jurisdiction over wholesale rates also encompassed "power allocations that affect wholesale rates." *Id.* at 371. Because the "prudence inquiry" mandated by the Mississippi Supreme Court required the state commission to review the prudence of the FERC order determining the allocation of costs associated with the nuclear power plant, the inquiry was preempted by FERC's exclusive jurisdiction.

*Id.*   The Court concluded, "FERC-mandated allocations of power are binding on the States, and States must treat those allocations as fair and reasonable when determining retail rates." *Id.*  at 371.

We do not find Defendants' reliance on *Mississippi Power & Light Co.* to be persuasive. *Mississippi Power & Light Co.* stands for the proposition that states cannot use their jurisdiction over retail rates to second-guess or review FERC-authorized rates that may affect retail rates. *See Gallo*, 503 F.3d at 1044 (relying on *Mississippi Power & Light Co.* to "support EnCana's position that wholesale sellers such as EnCana may raise the filed rate doctrine as a defense to actions putatively attacking retail rates, but having the effect of disallowing FERC-approved wholesale rates."). However, *Mississippi Power & Light Co.* does not support Defendants' broad reading of the phrase "practice . . . affecting [jurisdictional] rates."  In *Mississippi Power & Light Co.*, FERC had used its jurisdiction over practices affecting wholesale rates to determine an equitable allocation of nuclear power costs.  Defendants attempt to analogize the power allocations at issue in *Mississippi Power & Light Co.* with the market manipulation associated with nonjurisdictional transactions at issue in the present case.  However, that analogy cannot be squared with the *Gallo* court's holding that the NGA does not preempt state antitrust challenges to rates and practices associated with such nonjurisdictional sales.

## D.  FERC's Regulatory Authority

One final issue dividing the parties in this appeal is the extent to which FERC had authority to regulate the market manipulation that gave rise to the energy crisis in 2000–2001.

The Defendants point to the Code of Conduct promulgated by FERC in 2003 as evidence that FERC had regulatory authority over the anticompetitive conduct at issue, including the false price reporting and wash sales. FERC promulgated the Code of Conduct by amending the blanket market certificates governing jurisdictional sellers. *See* Amendments to Blanket Sales Certificates, 68 Fed. Reg. 66,323 (Nov. 26, 2003). The Commission stated that the need for the Code of Conduct "was informed by the types of behavior that occurred in the Western markets during 2000 and 2001." *Id.* ¶ 2. The Code prohibited *jurisdictional* sellers[14] "from engaging in actions without a legitimate business purpose that manipulate or attempt to manipulate market conditions, including wash trades and collusion." *Id.* ¶ 4. The Code further provides that jurisdictional sellers are required to provide complete and accurate transactional information to publishers of gas price indices. *Id.* ¶ 5.

While Defendants rely on the promulgation of the Code of Conduct as evidence that FERC had jurisdiction over the market manipulation at issue, there are two significant flaws in their argument. First, two years after the promulgation of the Code, Congress enacted the Energy Policy Act of 2005 ("EPA"),[15] which prohibits market manipulation and

---

[14] Section III.A of the Commission's final order is titled "Application of Code of Conduct to Jurisdictional Sellers," and paragraphs 14–22 discuss the scope of FERC's jurisdiction over the natural gas industry.

[15] The EPA provides, in relevant part:

> It shall be unlawful for any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the

authorizes FERC to promulgate rules and regulations to protect natural gas ratepayers.  There is a canon of statutory interpretation that counsels against reading acts of Congress to be superfluous.  *See American Nat'l Red Cross v. S.G.*, 505 U.S. 247, 263 (1992).  This canon suggests that Congress enacted the relevant provision of the EPA *because* FERC did not already have regulatory authority over the anticompetitive conduct at issue.

The second flaw in Defendants' argument is more relevant to our jurisdictional analysis.  Even if FERC did have the statutory authority to promulgate the 2003 Code of Conduct and to make it applicable to "first sales" and other nonjurisdictional sales, a close reading of the Code reveals that FERC limited the application of the Code to sales within its jurisdiction.  FERC acknowledged that because of acts deregulating first sales of natural gas, such sales were outside the scope of FERC's jurisdiction.  Amendments to Blanket Sales Certificates, 68 Fed. Reg. 66,323 ¶ 14 (Nov. 26, 2003).  FERC further noted that some commenters had raised "concerns regarding the potential adverse effect of imposing the proposed code of conduct only on the portion of the natural gas market under the Commission's jurisdiction," *id.* ¶ 16, and responded by stating, "The fact that the Commission does not regulate the entire natural gas market does not compel the Commission to refrain from exercising its authority over that portion of the gas market which is

---

Commission, any manipulative or deceptive device or contrivance. . . . in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers.

Pub. L. No. 109-58 tit. III, § 315 (codified at 15 U.S.C. § 717c-1).

within its jurisdiction to prevent the manipulation of prices." *Id.* ¶ 21. The discussion of jurisdictional limitations within the Code of Conduct itself suggests that the Code does *not* support the Defendants' argument that FERC had jurisdiction over the anticompetitive behavior related to nonjurisdictional sales. For these reasons, the 2003 enactment of the Code of Conduct does not affect our conclusion that the NGA does not grant FERC jurisdiction over claims arising out of false price reporting and other anticompetitive behavior associated with nonjurisdictional sales.

**IV.    The District Court's Orders Denying Plaintiffs Leave to Amend**

The *Farmland*, *Breckenridge*, *Learjet*, and *Heartland* Plaintiffs appeal the district court's October 29, 2010, order denying them leave to amend their complaints to add federal antitrust claims. Their motions for leave to amend their complaints were filed nine months after the March 2, 2009, scheduling deadline to amend pleadings. The *Breckenridge* Plaintiffs also appeal the district court's April 21, 2008, order denying them leave to amend their complaint to add a state law treble damages remedy.

We review a district court's decision denying leave to amend pleadings for abuse of discretion. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992). We hold that in the present case, the district court did not abuse its discretion in denying either of the two motions for leave to amend complaints, and therefore affirm both the October 29, 2010, order denying the *Farmland*, *Breckenridge*, *Learjet*, and *Heartland* Plaintiffs leave to amend their complaints to add federal antitrust claims, as well as the April 21, 2008, order denying the *Breckenridge* Plaintiffs leave to

amend their complaint to add a state law treble damages claim.

## A.  October 29, 2010, Order

We summarize briefly the procedural history of this case to provide context for our decision to affirm the district court's October 29, 2010, order.

On April 8, 2005, the district court granted summary judgment to the defendants in the *Texas-Ohio* and *Abelman* cases on the ground that the plaintiffs' claims in those cases were barred by the filed-rate doctrine.  *See In re Western States Wholesale Natural Gas Antitrust Litig.*, 368 F. Supp. 2d 1110 (D. Nev. 2005), *rev'd by* 243 Fed. App'x 328 (9th Cir. 2007) and *In re Western States Wholesale Natural Gas Antitrust Litig.*, 408 F. Supp. 2d 1055 (D. Nev. 2005), *rev'd by* 248 Fed. App'x 821 (9th Cir. 2007).  Four months later, the first of these present actions was filed.  In September 2007, this court issued its decision in *Gallo* and simultaneously reversed *Texas-Ohio* and *Abelman*, holding that the filed-rate doctrine does not bar state or federal antitrust claims arising out of the allegations that energy traders manipulated the price index.  *See E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027 (9th Cir. 2007);  *In re Western States Wholesale Natural Gas Antitrust Litig.*, 243 Fed. App'x 328 (9th Cir. 2007) (reversing *Texas-Ohio*); *In re Western States Wholesale Natural Gas Antitrust Litig.*, 248 Fed. App'x 821 (9th Cir. 2007) (reversing *Abelman*).  In November 2007, Defendants in the present case filed a new motion for summary judgment, and in May 2008, the District Court denied the motion, relying in part on *Gallo*.  In July 2008, Defendants asked the District Court to reconsider its May 2008 order denying their preemption-based motion for

summary judgment.  Finally, in November 2009 the District Court agreed to reconsider its May 2008 order.

The deadline to amend pleadings in this case was March 2, 2009.  On December 15, 2009 (approximately one month after the District Court agreed to reconsider its May 2008 order denying summary judgment), Plaintiffs filed motions to modify the scheduling order and for leave to amend their complaints to add claims under the federal Sherman Antitrust Act.

The district court denied the Plaintiffs' motions to amend their pleadings, noting that when a party seeks to amend a pleading after the pretrial scheduling order's deadline for amending the pleadings has expired, the moving party must satisfy the "good cause" standard of Federal Rule of Civil Procedure 16(b)(4), which provides that "[a] schedule may be modified only for good cause and with the judge's consent," rather than the liberal standard of Federal Rule of Civil Procedure 15(a).[16]  "Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Johnson*, 975 F.2d at 609.  While a court may take into account any prejudice to the party opposing modification of the scheduling order, "the focus of the [Rule 16(b)] inquiry is

---

[16] Fed. R. Civ. P. 15(a) provides that a party may amend its pleadings once as a matter of course within certain deadlines, and that in "all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. *The court should freely give leave when justice so requires*." (emphasis added).

upon the moving party's reasons for seeking modification . . . [i]f that party was not diligent, the inquiry should end."  *Id.*

The district court in the present case noted, "The good cause standard typically will not be met where the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action."  The district court found that Plaintiffs were not diligent in seeking the amendment to add federal Sherman Antitrust Act claims, because they had known since 2007 (after this court held in *Gallo* that federal antitrust claims were not barred by the filed-rate doctrine) that federal antitrust claims may be viable.

We hold that the district court did not abuse its discretion in concluding that the Plaintiffs were not diligent in seeking to amend their complaints to add federal antitrust claims.  Our analysis is guided by this court's decision in *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th Cir. 1992).  In *Johnson*, Dairl Johnson was injured while skiing at Mammoth Mountain ski resort.  *Id.* at 606.  He filed a diversity action against the ski lift manufacturer and Mammoth Recreations, Inc., a holding company that owned a majority of the stock in Mammoth Mountain Ski Area, Inc., the entity that actually owned and operated the ski resort.  *Id.*  The district court filed a scheduling order which established a cut-off date of October 17, 1989, for joining additional parties.  *Id.*  Four months after this deadline passed, Johnson moved to join Mammoth Mountain Ski Area, Inc., claiming that he was unaware of the existence of Mammoth Mountain Ski Area, Inc., and its corporate relationship with Mammoth Recreations, Inc.  *Id.* at 607.  The court found that Johnson had failed to demonstrate good cause for his belated motion to amend, since "Mammoth Recreation's answer to the

complaint and response to interrogatories amply indicated that Mammoth Recreations did not own and operate the ski resort, and thus any theory of liability predicated upon that fact would fail." *Id.* at 609. As in *Johnson*, the Plaintiffs here have failed to demonstrate good cause for their untimely motion to amend, and thus, the district court did not abuse its discretion in denying that motion. We therefore affirm the district court's October 29, 2010, order denying Plaintiffs leave to amend their complaints to add federal antitrust claims.

## B. April 21, 2008, Order

On March 4, 2008, the *Heartland* Plaintiffs filed a motion for leave to amend their complaint to add a treble damages claim under the Colorado state antitrust statute. Previously, their complaint had sought only a full refund. The district court denied the motion, stating, "Plaintiffs have been aware of the availability of an actual damages claim under the Colorado antitrust statutes since the inception of the case, but chose to plead under the full refund provision only." The district court found that Plaintiffs' failure to seek leave to add an actual damages claim was explicable during the time between the district court's 2005 ruling in *Texas-Ohio* and *Abelman* that such claims were barred by the filed-rate doctrine and this court's decision in *Gallo* holding that such claims were *not* barred. However, this court decided *Gallo* in September 2007, and Plaintiffs did not move to amend their complaint to add an actual damages claim until March 4, 2008.

The district court considered it relevant that Plaintiffs had requested leave to amend to add an additional defendant on October 12, 2007, but did not make a request to add the treble

damages claim at that time. The court denied the Plaintiffs' March 4, 2008, motion for leave to amend to add a treble damages claims, finding that Plaintiffs unduly delayed amendment by waiting "until after this Court granted summary judgment on the full consideration claim, several months after *Gallo*, to seek leave to amend to add a new theory of liability of which Plaintiffs have been aware since the inception of this suit."

Although Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires," it "is not to be granted automatically." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990). This court considers the following five factors to assess whether to grant leave to amend: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990).

The district court in the present case relied heavily on the fifth factor. It noted that a "district court's discretion [whether to grant leave to amend] is 'particularly broad' in deciding subsequent motions to amend where the court previously granted leave to amend." This court's decision in *Royal Insurance Company of America v. Southwest Marine*, 194 F.3d 1009 (9th Cir. 1999) is instructive. Royal Insurance Company sued Southwest for breach of contract, breach of warranty, and negligence after Southwest allegedly caused $900,000 of damage to a boat insured by Royal Insurance. *Id.* at 1013. Royal Insurance amended its complaint twice – once to correct minor deficiencies in the original complaint, and once to assert additional claims against Southwest. *Id.* at 1013 n.1. However, the district court denied Royal

Insurance's motion for leave to file a third amended complaint to assert further claims against Southwest, which Royal filed after the district court granted summary judgment in favor of Southwest. *Id.* at 1013.

On appeal, this court stated, "Late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action." *Id.* at 1016–17 (internal quotation marks omitted). We relied on the fact that Royal Insurance had knowledge of the relevant facts from the inception of the lawsuit, and also the fact that Royal had twice before amended its complaint, to hold that the district court did not abuse its discretion by denying Royal's motion for leave to file a third amended complaint. *Id.* at 1017 ("Considering that Royal had twice before amended its complaint and moved to amend a third time only after the district court dismissed its claims on summary judgment, the district court did not abuse its discretion by denying Royal's motion to amend.").

In the present case, we find that the district court did not abuse its discretion in denying the *Heartland* Plaintiffs' motion for leave to amend to add a treble damages state law claim. We therefore affirm the district court's order denying that motion.

## V. Dismissal of the AEP Defendants from the *Arandell* and *Heartland* Lawsuits

The district court entered separate orders dismissing the AEP Defendants[17] from the *Arandell* suit filed in Wisconsin state court and dismissing the AEP Defendants from the *Heartland* suit filed in Missouri state court prompted by the AEP Defendants' motions to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).   This court reviews *de novo* a district court's determination that it does not have personal jurisdiction over a defendant. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

### A.  Facts

The operative facts alleged in each case are substantially similar.   The *Arandell* Plaintiffs filed a class action in Wisconsin pursuant to the Wisconsin Antitrust Act, Wisconsin Statutes ch. 133, brought by and on behalf of a class consisting of all Wisconsin industrial and commercial purchasers of natural gas for consumption in Wisconsin between January 1, 2000 and October 21, 2002.   Their complaint alleged that during the relevant time period, the Defendants conspired to restrain trade or commerce relating to natural gas.

The *Heartland* Plaintiffs filed a class action in Missouri pursuant to the Missouri Antitrust Laws, Missouri Statutes § 416.010 *et seq.*, brought by and on behalf of a class consisting of all Missouri industrial and commercial

---

[17] The "AEP Defendants" are American Electric Power Company ("AEP") and its subsidiary, AEP Energy Services, Inc ("AEPES").

purchasers of natural gas for consumption in Missouri between January 1, 2000 and October 21, 2002. Their complaint alleged that during the relevant time period, the Defendants conspired to restrain trade or commerce relating to natural gas.

None of the following basic facts about AEP's corporate structure are in dispute. AEP is a New York corporation with its principal place of business in Columbus, Ohio. During the relevant time period in each case, AEP wholly owned and controlled its subsidiary, AEP Energy Services, Inc. (AEPES), an Ohio corporation with a principal place of business in Columbus, Ohio. AEP is a holding company that derives its income from dividends on its subsidiaries' stocks; the AEP Defendants have no office, bank accounts, property, or employees in either Wisconsin or Missouri; the AEP Defendants have not qualified to do business in either Wisconsin or Missouri and have not appointed a registered agent for service of process in either of those states; the AEP Defendants have not paid taxes, manufactured products, or performed services in either Wisconsin or Missouri; and the AEP Defendants have not directed advertising specifically at Wisconsin or Missouri residents.

In the *Arandell* case, the Plaintiffs claim specific personal jurisdiction[18] over the AEP Defendants because their actions pursuant to the alleged conspiracy "were intended to have, and did have, a direct, substantial, and reasonably foreseeable effect on commerce in Wisconsin during the Relevant Time Period." Plaintiffs alleged that personal jurisdiction existed over AEP based on the activities of its corporate affiliates,

---

[18] The *Arandell* Plaintiffs do not argue that the district court could exercise general personal jurisdiction over AEP or AEPES.

namely AEPES, which entered into a long-term "natural gas supply agreement with Wisconsin Electric Power Company during the Relevant Time Period, and sold natural gas to Wisconsin Electric Power Company pursuant to that agreement."

The district court found that from 1998–2003, AEPES entered into natural gas supply agreements with various Wisconsin companies, and that trade confirmations evince numerous sales made to companies with Wisconsin addresses throughout 2001–2003. AEP acted as a guarantor for AEPES during the relevant time period to facilitate AEPES's business, including issuing guarantees on AEPES's behalf to several Wisconsin-based entities. However, AEPES has never entered into a contract or delivered gas to any of the named plaintiffs in the case.

The *Heartland* case presents substantially similar facts. The *Heartland* Plaintiffs claim specific personal jurisdiction[19] over the AEP Defendants because their actions pursuant to the alleged conspiracy "were intended to have, and did have, a direct, substantial, and reasonably foreseeable effect on commerce in Missouri during the Relevant Time Period." Plaintiffs allege that personal jurisdiction existed over AEP based on the activities of its corporate affiliates, namely AEPES, which sold natural gas to Missouri entities during the relevant time period. The Plaintiffs also allege that one of the primary Missouri entities that AEP traded with, Aquila Merchant Services, was "an active member of the conspiracy to manipulate natural gas prices."

---

[19] The *Heartland* Plaintiffs do not argue that the district court could exercise general personal jurisdiction over AEP or AEPES.

The district court found that from 1997–2001, AEPES entered into natural gas supply agreements with various Missouri companies. From 2000–2002, AEPES sold billions of dollars worth of natural gas to Missouri-based entities. AEP acted as a guarantor for AEPES during the relevant time period to facilitate AEP Energy Services's business, including issuing guarantees on AEPES's behalf to several Missouri-based entities. However, AEPES has never entered into a contract with either of the named Plaintiffs in this case.

## B. Analysis

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128–29 (9th Cir. 2003). However, the plaintiff must make "only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). For the purposes of deciding whether a prima facie showing has been made, "the court resolves all disputed facts in favor of the plaintiff." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).

Personal jurisdiction over a nonresident defendant is proper if permitted by a state's long-arm statute[20] and if the

---

[20] The Wisconsin Supreme Court has held that Wisconsin's long-arm statute, Wis. Stat. § 801.05, allows for the exercise of jurisdiction to the full extent allowed by the due process clause. *See Rasmussen v. General Motors Corp.*, 803 N.W.2d 623, 630 (Wis. 2011) (stating that "§ 801.05 was intended to provide for the exercise of jurisdiction over nonresident defendants to the full extent consistent with the requisites of due process of law") (internal citations omitted). The "jurisdictional inquiries under state law and federal due process merge into one analysis" when, as here,

exercise of that jurisdiction does not violate federal due process. *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 893 (9th Cir. 1996). For the exercise of jurisdiction to satisfy due process, a nonresident defendant, if not present in the forum, must have "minimum contacts" with the forum such that the assertion of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). A federal district court may exercise either general or specific personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 (1984). To establish general jurisdiction, the plaintiff must demonstrate that the defendant has sufficient contacts to "constitute the kind of continuous and systematic general business contacts that approximate physical presence." *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1124 (9th Cir. 2002) (internal quotation marks omitted). However, because the Plaintiffs do not claim that the district court could exercise general jurisdiction in either Wisconsin or Missouri over the AEP Defendants in this case, the only relevant question on appeal is whether the district court could exercise specific personal jurisdiction over the AEP Defendants.

---

the state's long-arm statute is "coextensive with federal due process requirements." *Roth v. Garcia Marquez*, 942 F.2d 617, 620 (9th Cir. 1991). In Missouri, however, the Missouri Supreme Court has held that there are two separate inquiries: "one inquiry to establish if a defendant's conduct was covered by the long-arm statute, and a second inquiry to analyze whether the exercise of jurisdiction comports with due process requirements." *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 909 (8th Cir. 2012) (citing *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 231 (Mo. 2010)).

This court uses the following three-part test to analyze whether a party's "minimum contacts" meet the due process standard for the exercise of specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable

*Schwarzenegger*, 374 F.3d at 802. "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995). While all three requirements must be met, this court has stated that in its consideration of the first two prongs, "[a] strong showing on one axis will permit a lesser showing on the other." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006) (en banc). That means that a single forum state contact can support jurisdiction if the cause of action arises out of that particular purposeful contact of the defendant with the forum state. *Id.* (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)). The district court in the *Arandell* and *Heartland* cases focused its analysis on the allegations that AEPES made sales to Wisconsin- and Missouri-based entities and

found that the Plaintiffs had not met their burden of proving the second requirement for specific jurisdiction.[21]  This court has referred to the second prong of the specific jurisdiction test as a "but for" test.  *See Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1988), *rev'd on other grounds*, *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991).[22] Under the "but for" test, "a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action."  *Fireman's Fund Ins. Co.*, 103 F.3d at 894.  The district court found that there was no causal nexus between AEP Defendants' activities in the forum states (selling natural gas to non-Plaintiff third parties) and the harm allegedly suffered by the Plaintiffs (buying gas at inflated prices from third party sellers).

We need not decide whether personal jurisdiction could be grounded on the AEP Defendants' sales of natural gas in the forum states to third parties.  The *Arandell* and *Heartland* Plaintiffs also predicated their antitrust claims on the AEP Defendants' manipulation of the price indices pursuant to a conspiracy to inflate natural gas prices.  The district court conducted the personal jurisdiction analysis based on the

---

[21] The district court assumed, without expressly deciding, that AEPES's sales to Wisconsin- and Missouri-based entities and delivery of natural gas to the forum were sufficient to satisfy the "purposeful availment" prong of the specific jurisdiction inquiry.  Because it found that Plaintiffs failed to show that their claims arose out of AEPES's contacts with Wisconsin and Missouri, it did not address the third prong of the specific jurisdiction inquiry (whether the exercise of jurisdiction would be reasonable).

[22] *See Doe v. American Nat'l Red Cross*, 112 F.3d 1048, 1051 n.7 (9th Cir. 1997) (noting that even after the Supreme Court's decision in *Shute*, "the 'but for' test is still employed in determining whether a plaintiff's injuries arose out of the defendant's forum-related activities.").

natural gas sales only. We find that the district court erred in failing to analyze whether Plaintiffs' allegations of anticompetitive behavior directed at the forum states are sufficient to support the exercise of specific personal jurisdiction.

There is no question that the Plaintiffs' state antitrust claims arise out of the AEP Defendants' collusive manipulation of the gas price indices.[23] In other words, their claims "arise[] out of or relate[] to" the Defendants' alleged forum-related activities. *Schwarzenegger*, 374 F.3d at 802. The second prong of the test for specific personal jurisdiction is therefore satisfied. The key issue in this analysis is therefore whether the AEP Defendants' price manipulation satisfies the *first* prong of the specific personal jurisdiction inquiry, i.e., whether "[t]he non-resident defendant . . . purposefully direct[ed] his activities or consummat[ed] some transaction with the forum or resident thereof; or perform[ed] some act by which he purposefully avail[ed] himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." *Id*. This first prong is satisfied by showing either purposeful availment or purposeful direction, which are two distinct concepts. *See Washington Shoe Co. v. A-Z Sporting Goods, Inc.*, 704 F.3d 668, 672 (9th Cir. 2012).

---

[23] For example, the *Arandell* Plaintiffs allege, "The actions of the defendants resulted in the plaintiffs paying inflated prices for natural gas during the Relevant Time Period. During the Relevant Time Period, natural gas prices in Wisconsin more than doubled. The plaintiffs paid higher prices for natural gas than they otherwise would have paid if the defendants' conspiracy had not existed."

"Purposeful direction" requires that the defendant allegedly must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Washington Shoe*, 704 F.3d at 673 (quoting *Mavrix Photo, Inc. v. Brand Techs, Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011)).  This test for "purposeful direction" is based on the Supreme Court's test in *Calder v. Jones*, 465 U.S. 783 (1984).**[24]**

The facts alleged in these causes of action present a compelling case for finding that the AEP Defendants "purposefully directed" their anticompetitive behavior at the forum states.  The first two prongs of the "purposeful direction" test ask whether there was an "intentional act"**[25]**

---

**[24]** The plaintiff in *Calder* was an entertainer who lived and worked in California.  465 U.S. at 785.  She brought suit in California state court against the National Enquirer after the tabloid published a story alleging that the plaintiff had an alcohol problem.  *Id*. at 784, 788 n.9.  The article was written in Florida, and the National Enquirer was published in Florida with a large circulation in California.  *Id*. at 785.  The California courts "concluded that a valid basis for jurisdiction existed on the theory that [the defendants] intended to, and did, cause tortious injury to [the plaintiff] in California."  *Id*. at 787.  The Supreme Court affirmed, holding that jurisdiction in California was proper because the defendants' intentional conduct in Florida was calculated to cause injury to the plaintiff in California.  *Id*. at 791.

**[25]** This court has recently defined "intentional act" as "an external manifestation of the actor's intent to perform an actual, physical act in the real world, not including any of its actual or intended results." *Washington Shoe*, 704 F.3d at 674.

that was "expressly aimed at the forum state."[26]  Here, the pleadings contain allegations of "intentional acts" in the form of anticompetitive behavior expressly aimed at the forum states.   The Wisconsin *Arandell* Plaintiffs alleged, for example, that AEP "either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information," actions which were "intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce in Wisconsin."  By alleging acts "intended to have" an effect in Wisconsin, the Plaintiffs went beyond alleging acts with a "mere foreseeable effect" in the forum.  *See Pebble Beach*, 453 F.3d 1156 (citing *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)).  They alleged intentional acts by the AEP Defendants that were "directed at the forum state" itself.  *Id.* at 1158.

The *Arandell* Plaintiffs further alleged that AEP's officers or directors made agreements "which tended to advance or control the market prices of natural gas that its affiliates sold in the United States or in Wisconsin" and that these officers or directors made "strategic marketing policies and decisions" to report prices to natural gas price indices "that affected the market prices of natural gas."  The policies and decisions, alleged the *Arandell* Plaintiffs, were "implemented on an operational level by affiliates, such as [AEPES]."   The *Arandell* Plaintiffs also claimed that all Defendants (including

---

[26] "We have repeatedly stated that the 'express aiming' requirement is satisfied, and specific jurisdiction exists, when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state."  *Washington Shoe*, 704 F.3d at 675 (internal quotation marks omitted).

the AEP Defendants) "worked together to fraudulently increase the retail price of natural gas paid by commercial entities in Wisconsin." This conspiracy was allegedly carried out through unlawful acts that were "ordered and performed by their officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of defendants' business or affairs." For example, the Plaintiffs alleged that "American Electric Power Company and AEP Energy Services, Inc. traders were instructed by their superiors to adjust the prices and volumes of trades they had made and, in some cases, to report trades that never occurred." The "purpose and effect" of this was to "collusively and artificially inflate the price of natural gas paid by commercial entities in Wisconsin." These alleged facts, taken as true, establish that the AEP Defendants' price manipulation was "expressly aimed" at Wisconsin, because the AEP Defendants knew and intended that the consequences of their price manipulation would be felt in Wisconsin. *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1258 (9th Cir. 2008).

The third prong of the "purposeful direction" test asks whether the intentional acts caused harm that the defendant knows is likely to be suffered in the forum state. In the present case, the *Arandell* Plaintiffs further alleged that each defendant "committed one or more acts or omissions outside of Wisconsin, which caused an injury to person or property within Wisconsin." Such injury included increases in the price of gas, which was specifically alleged in the complaint – for example, the Plaintiffs alleged that the city gate price for natural gas in Wisconsin nearly quadrupled in the span of a year, while the price for commercial consumers more than doubled. The harm was magnified by increased price volatility, which "caused commercial entities in Wisconsin to

incur greater expenses associated with hedging natural gas costs," further injuring the Plaintiffs by "depriving them of the right and ability to make risk management, resource allocation and other financial decisions relating to natural gas, in a full and free competitive market."

In this case, the amount of harm in Wisconsin, and the specificity with which it was alleged, is sufficient to satisfy the third prong of the "purposeful direction" test. Our case law does not require that the "brunt" of the harm be suffered in the forum state; as long as "a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." *La Ligue*, 433 F.3d at 1207. For these reasons, we find that the *Arandell* Plaintiffs have alleged sufficient facts to support the exercise of specific personal jurisdiction over the AEP Defendants on the theory that the AEP Defendants "purposefully directed" their anticompetitive conduct at the forum state of Wisconsin.

The district court did not address the third prong of the personal jurisdiction inquiry, whether the exercise of jurisdiction would "comport with fair play and substantial justice" – in other words, whether the exercise of jurisdiction would be reasonable. *Schwarzenegger*, 374 F.3d at 802. Once the Plaintiffs have shown that the exercise of personal jurisdiction satisfies the first two prongs of the personal jurisdiction test, the burden shifts to the defendant to make a "compelling case" that the exercise of jurisdiction would be unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985). This court considers the following seven factors in determining whether the exercise of jurisdiction would be reasonable:

> (1) the extent of the defendant's purposeful interjection into the forum state, (2) the burden on the defendant in defending in the forum, (3) the extent of the conflict with the sovereignty of the defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum.

*Bancroft*, 223 F.3d at 1088.  We find that the AEP Defendants have not made a "compelling case" based upon any of these factors that the exercise of personal jurisdiction in Wisconsin would be unreasonable.

For these reasons, we reverse the district court's order dismissing the AEP Defendants from the Wisconsin *Arandell* case for lack of personal jurisdiction.  The Missouri *Heartland* Plaintiffs alleged similar facts as the Wisconsin *Arandell* Plaintiffs, and therefore our analysis applies with equal force to the *Heartland* case.  We note, however, that the *Heartland* Plaintiffs appeal the district court's dismissal of AEPES for lack of personal jurisdiction, but do not challenge the district court's dismissal of AEP, the parent company.[27] The *Heartland* Plaintiffs thus appear to have waived any argument for personal jurisdiction over AEP and we reverse the district court's order in *Heartland* dismissing the AEP

---

[27] The *Heartland* Plaintiffs' opening brief states, "the *Heartland* plaintiffs are appealing the District Court's dismissal of one defendant – AEP Energy Services, Inc. – from that case for lack of personal jurisdiction."

Defendants for lack of jurisdiction in *Heartland* as to AEPES only.

## VI.    Order Granting Duke Energy Trading and Marketing's Motion for Partial Summary Judgment

Several Plaintiffs in *Arandell Corp. v. Xcel Energy, Inc.* appeal the district court's order granting Defendant Duke Energy Trading and Marketing, LLC's ("DETM") motion for partial summary judgment based on the district court's interpretation of Wisconsin Statutes § 133.14.[28]  This court reviews *de novo* a district court's interpretation of state law. *See Hauk v. J.P. Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009).

Several Wisconsin corporations (Arandell Corp., Merrick's, Inc., Safety-Kleen Systems, Inc., and Sargento Foods) brought suit against natural gas sellers in Wisconsin state court, alleging two causes of action under Wisconsin state law.  Count One arose under Wisconsin Statutes § 133.14, which voids contracts to which an antitrust conspirator is a party and allows recovery of payments made pursuant to such a contract.  Count Two sought treble damages under Wisconsin Statutes § 133.18, which provides that "any person" injured, directly or indirectly, by a violation of the Wisconsin Antitrust Act may recover treble damages.

---

[28] The Plaintiffs have filed a Motion to Certify Question of Wisconsin State Law to the Wisconsin Supreme Court.  Because we find that the plain text of Wisconsin Statutes § 133.14 is clear, we do not believe that certification is necessary as a "means to obtain authoritative answers to unclear questions of state law," and we therefore deny the motion.  *Toner v. Lederle Labs., Div. of Amer. Cyanamid Co.*, 779 F.2d 1429, 1432 (9th Cir. 1986).

All but one of the named Defendants moved to dismiss or for summary judgment on Count One of Plaintiffs' Amended Complaint. They argued that the Plaintiffs lacked standing to assert a claim against them under Wisconsin Statutes § 133.14 because none of the named Plaintiffs purchased natural gas directly from any of the moving defendants. Wisconsin Statutes § 133.14 provides:

> All contracts or agreements made by any person while a member of any combination or conspiracy prohibited by [§] 133.03, and which contract or agreement is founded upon, is the result of, grows out of or is connected with any violation of such section, either directly or indirectly, shall be void and no recovery thereon or benefit therefrom may be had by or for such person. *Any payment made upon, under or pursuant to such contract or agreement to or for the benefit of any person may be recovered from any person who received or benefitted from such payment in an action by the party making any such payment or the heirs, personal representative or assigns of the party*.

Wis. Stat. § 133.14 (emphasis added). In interpreting a state statute, a federal court applies the relevant state's rules of statutory construction. *See In re Lieberman*, 245 F.3d 1090, 1092 (9th Cir. 2001). In Wisconsin, to determine the meaning of a statutory provision, courts begin with the statute's plain language, "taking into consideration the context in which the provision under consideration is used," and furthermore, "[s]tatutory language is given its common,

ordinary, and accepted meaning." *Burbank Grease Servs., LLC v. Sokolowsi*, 717 N.W.2d 781, 788 (Wis. 2006).

We agree with the district court's conclusion that the statutory text at issue is unambiguous. Section 133.03 makes illegal every contract, combination, or conspiracy in restraint of trade or commerce. *See* Wis. Stat. § 133.03(1). The first sentence of Section 133.14 therefore provides that any contract made by a member of an antitrust conspiracy is void, and no conspirator who is a party to that contract may recover or benefit therefrom. The second sentence of Section 133.14 permits the party making a payment "upon, under or pursuant to such contract" to recover those payments. There is no provision authorizing recovery by indirect purchasers or other non-parties to the voided contract.[29]

Plaintiffs argue that the Wisconsin legislature intended for the Wisconsin Antitrust Act to be interpreted as broadly as possible. For example, they quote Wisconsin Statutes § 133.01, which provides, "It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition." However, evidence that the legislature intended the Act to be applied broadly cannot overcome the plain text of Section 133.14, which does not provide for recovery for indirect purchasers or other non-parties to the contract.

---

[29] This is in contrast to Section 133.18, which does permit indirect purchasers to recover treble damages. *See* Wis. Stat. § 133.18 (providing, in relevant part, that "any person injured, *directly or indirectly*, by reason of anything prohibited buy this chapter may sue therefor and shall recover threefold the damages sustained by the person") (emphasis added).

After the district court held on February 19, 2008, that "the party seeking the recovery [under Section 133.14] must have been a party to the void contract, or at least have made payments based on the contractual obligation set forth in the conspirator's contract," Plaintiffs Sargento, Merrick's, and Ladish admitted that they had no direct purchase agreements with DETM. Therefore, the district court concluded, "No genuine issue of material fact remains that Sargento, Merrick's, and Ladish did not purchase natural gas directly or through an agent from DETM," and granted summary judgment on Count One of Plaintiffs' Amended Complaint as to these three Plaintiffs. Because we agree with the district court's conclusion that the plain text of Wisconsin Statutes § 133.14 allows recovery only by plaintiffs who were direct purchasers under the voided contract, we affirm the district court's order granting partial summary judgment to DETM.

## VII.    Conclusion

We **REVERSE** the district court's order granting summary judgment to Defendants on preemption grounds, **REVERSE** in part the district court's orders dismissing the AEP Defendants from the Wisconsin *Arandell* and Missouri *Heartland* suits, and **AFFIRM** all other orders at issue in this appeal. We **REMAND** to the district court for further proceedings consistent with this opinion.[30]

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**

---

[30] The parties shall bear their own costs on appeal.